## SLAUGHTER v. ANDREWS et al.
### No. 11630.

Court of Civil Appeals of Texas. Dallas.
May 4, 1935.

Rehearing Denied June 8, 1935.

Worsham, Rollins, Burford, Ryburn & Hincks and W. H. Flippen, all of Dallas, for appellant.

Thompson, Knight, Baker & Harris, J. Hart Willis, Lewis M. Dabney, Jr., and D. A. Frank, all of Dallas, for appellees.

BOND, Justice.

Warren P. Andrews and Hale Davis instituted this suit in a district court of Dallas county against E. Dick Slaughter, to collect a real estate commission for closing a 99-year lease from Slaughter to Neiman-Marcus Company. On the findings of the jury that the appellees were the procuring cause, judgment was rendered against appellant for the sum of $18,893.07.

We think the case turns upon whether the appellees had a contract with the appellant as will support a recovery for commissions to lease the property to Neiman-Marcus Company, and, if so, whether the evidence is sufficient to raise an issue as to whether the appellees were the procuring cause culminating in the closing of the lease. If appellees had such contract and the lease made by appellant and Neiman-Marcus Company was the proximate result of appellees' efforts, then the findings of the jury must be given complete verity and this court would not be authorized to disturb its findings.

The evidence is undisputed: Slaughter, the appellant, was the owner of a parcel of land in the city of Dallas adjacent to the clothing store of Neiman-Marcus Company. Several real estate agents, not parties to this suit, including Ed Stewart and Henry Miller, had been, for more than three and one-half years, trying to close a lease contract between Slaughter and Neiman-Marcus Company. The Neiman-Marcus Company were very anxious to lease the property, and let it be known generally that on account of their increased volume of business they either had to have the Slaughter property, or build an addition to their own building, or move to another location. Slaughter was equally interested in leasing his property to Neiman-Marcus Company. The known desires of each resulted in the submission of figures as a basis for an agreement. The real estate agents, Stewart and Miller, were handling the deal, and finding that they could come to no agreement—Neiman-Marcus holding out for a lower rental price, and Slaughter contending for a higher price—apparently ceased further negotiations, yet, entertaining hope of eventually bringing about the lease. Finally, Neiman-Marcus did close the lease with Slaughter, resulting through the agency of Stewart and Miller, Slaughter paying to Stewart and Miller the sum of $10,000 as commission for making the deal.

The appellee Davis knowing that Neiman-Marcus Company had been negotiating with Slaughter for the lease of the property, and that they had come to no

agreement on the amount to be paid for the lease, and knowing that the appellee Andrews had a client, Jesse Jones of Houston, Tex., with whom he had been negotiating to sell or lease another piece of property in Dallas, and who wanted a lot of the dimensions of the Slaughter lot, 100x100 feet, talked the matter over with Andrews, and they decided to interview Slaughter relative to the lot mentioned in this litigation. So, on or about October 1, 1925, 'Andrews and Davis went to see Slaughter, and, in the course of their conversation, told Slaughter that they wanted to lease his property, that they were in the real estate business, and had a client, a wealthy party living in Houston (having in mind Mr. Jones), who would likely give consideration to leasing and improving his property and erecting thereon a large office building. Slaughter asked Andrews, "Who is your friend, Warren?" And he said, "I don't care to disclose that, he is very strong and I want to locate him in Dallas." In response to the proposal to lease, Slaughter said that he desired to lease his property, relating the length of time he desired the lease to run, and the value of the improvements to be placed thereon, but, on account of a pressing engagement elsewhere, deferred further consideration of the matter. In the meantime, on the next day, Slaughter became ill, Andrews called him by telephone, and in that conversation Slaughter told Andrews "that he was going out of town just as soon as he was able to travel, and that he wanted me to go and handle the matter with Mr. Flippen; that Mr. Flippen was authorized to go ahead and handle it, and for me to take all matters thereafter up with Mr. Flippen while he was away." Andrews and Davis had no other conversation with Slaughter prior to the closing of the lease with Neiman-Marcus Company. All further negotiations were carried on through Mr. Flippen, as an agent of Slaughter.

Shortly after Slaughter left Dallas, Andrews and Davis interviewed Neiman and Marcus relative to leasing the Slaughter property, and obtained from them proposals as basis for the lease, and submitted them to Mr. Flippen. Mr. Flippen, without knowledge as to what had transpired in the conversation between Slaughter and Andrews and Davis, submitted counter proposals for consideration of Neiman-Marcus Company, and many propositions and counter propositions were exchanged between Flippen and Neiman-Marcus Com-

pany, through Andrews and Davis. Finally, Neiman-Marcus Company not willing to close the lease, declined to deal further with Andrews and Davis, and renewed their negotiations with Stewart and Miller. Thereupon, Andrews and Davis advised Flippen that the negotiations with Neiman-Marcus had ended. Slaughter, on return to Dallas, closed the deal with Neiman-Marcus Company, and paid the real estate commission to Stewart and Miller.

The appellee Andrews testified that he had, prior to the conversation with Slaughter, offered Jones a lot located at Main and Akard, in Dallas, which Jones said was too small, that he asked Davis to suggest a lot "commensurate with Mr. Jones' desires," and he suggested the Slaughter lot, and they immediately called on Slaughter. Andrews testified further that in the conversation with Slaughter, "I said to Mr. Slaughter that I had in mind a man who lived out town; that I wanted to assure him of this one fact, that he was financially able to take care of any contract that he might make and that he could feel sure of that, and that he was qualified to lease the property." The appellant Slaughter's testimony, which is uncontradicted, throws additional light on what was within' the contemplation of the parties; he testified, viz.: "Well, he (Andrews) said that he had a very rich client, that he wanted to get a piece of property well located to build an office building on and I told Andrews that if he had an offer from his rich out-of-town friend, as he claimed he had, to take it up with Billy Flippen, my lawyer, and Flippen would look into it and if Flippen thought I would be interested and that Andrew's client was strong enough and would pay enough and would yield to my requirements, then Flippen would take it up with me."

█ Now the question is: Does the evidence raise the issue as to whether or not Slaughter employed Andrews and Davis, either personally, or did he authorize Flippen to employ them to negotiate a deal with any other person save their wealthy out-of-town client? It cannot be controverted that either Slaughter himself had to employ appellees or he had to authorize Flippen to do so. We believe that a reasonable construction of the agreement of the parties, as above recited, is that the appellees were authorized by appellant to negotiate only with a substantial out-of-town man for the leasing of appellant's property on terms satisfactory to appellant;

that the appellees did not have any authority whatever to undertake to interest any one or to negotiate with any one except within the terms of the understanding had; and that Flippen had authority only to handle the transaction within the contemplation of the parties, that was, to interest and negotiate with a substantial out-of-town man in a ninety-nine-year lease on the Slaughter lot. There is no contention made either in pleading or evidence that Flippen had authority to employ the appellees, or that he did do so.

 The rights of a real estate broker to recover compensation must be predicated upon a contract of employment, express or implied. If Andrews and Davis were not employed by Slaughter to interest and negotiate a lease with Neiman-Marcus Company, equally so, Mr. Flippen did not employ them and had no such authority to bind Mr. Slaughter. Whatever authority Mr. Flippen had, evidently it was in reference to the understanding and agreement of Slaughter and Andrews and Davis. Andrews and Davis were directed by Slaughter to take "the matter" up with Flippen, that Flippen would handle "the transaction" and submit "the matter" to him. What "matter," what "transaction" were they talking about? Clearly, it could have no other reference but that of interesting and negotiating with a wealthy out-of-town man, a client of Andrews. So, the employment of appellees to negotiate a lease with a designated client is not sufficient to authorize them to negotiate with any one else, and, if it could be determined that Andrews and Davis were the procuring cause which ultimately closed the lease between Slaughter and Neiman-Marcus Company, they cannot recover therefor in the absence of a contract of employment as will support a recovery for commissions to lease the property to the lessee. Assuming, for the sake of argument, that appellees were employed; likewise, assuming that appellees in their negotiations interested Neiman-Marcus Company in the lease, were they the procuring cause? We think not. They did not find Neiman-Marcus Company, they did not produce a customer ready, willing, and able to close the deal, and they were not present when the deal was closed. The contracting parties did not come to an agreement on any amount of rentals submitted through appellees, and appellees stopped their negotiations when Neiman-Marcus, several days before a lease agreement was made, terminated and abandoned all negotiations for the lot through the appellees, refused to deal through them and so advised them.

 To predicate the rights of appellees to recover compensation, the evidence must show affirmatively that they produced a proposed lessee who was ready, willing, and able to lease the property upon terms satisfactory to the owner, or upon terms stated by the owner, or that the lease was made as a direct result of appellees interesting the lessee, and as a direct and proximate result of their negotiations with the parties. We think the evidence falls short of establishing that appellees were the procuring cause of the contracting parties in arriving at an agreement on terms of the lease.

We regard it unnecessary to discuss the various assignments of error presented by appellant. We conclude appellees, under the related facts, have no contract of employment to lease generally appellant's property, or an agreement by which an inference may reasonably be drawn, that the appellant obligated himself to pay them commission on the Neiman-Marcus deal. The lease was not made under the terms of their understanding, therefore, no liability exists in support of the findings of the jury; the trial court erred in overruling appellant's motion for a peremptory instruction and in not rendering judgment in his favor. The judgment of the lower court is reversed and here rendered for appellant.

Reversed and rendered.

### On Motion for Rehearing.

It will be observed that our original opinion is based on two holdings: (1) That there was no general contract of employment, express or implied; and (2) that appellees were not the procuring cause of making the lease. The opinion fairly reflects, as we view it, the material facts bearing on the issues on which our judgment is based. However, in deference to appellees' request, additional facts are here presented in chronological sequence to those heretofore cited, which appellees insist are material on the issues:

Several months prior to the conversation Andrews and Davis had with Slaughter, in which Andrews told Slaughter that they had a client, a wealthy party living in Houston, who would likely give consideration to leasing and improving appellant's property, erecting thereon a large

office building, appellee Davis, without divulging to Slaughter that he was a real estate agent, talked with Slaughter over the telephone and "asked him if that property was to lease, and he said it was provided I could find a satisfactory man * * * that he was interested in leasing it to a desirable and satisfactory man to him." Davis was not personally acquainted with Slaughter at the time of this conversation. Slaughter did not know he was a real estate man. Davis did not follow the proposition further, for the reason, as stated by him, "because there was not anything to follow up. I was then working on a location for an insurance building. * * * Mr. Andrews had nothing to do with it when I called him that time.

"Q. But after that conversation over the telephone, when Mr. Andrews talked to him about a building site for Jesse Jones, you thought you had better go back and see him again? A. No, sir, we were looking for an entirely different proposition.

"Q. A different outfit? A. Yes, sir."

Several months later, about October 1, 1925, Andrews and Davis went to Slaughter's office. Appellee Andrews testified, "I introduced Mr. Hale Davis to him (Slaughter) and told Mr. Slaughter that Mr. Davis was a real estate man, in the real estate business, and that he and I were working together. * * *" Davis testified: "Q. What did Mr. Slaughter say to you at that time, to you and Mr. Andrews, in reference to whether or not he desired to lease that property, and what was the conversation at that time, and did you then communicate to him who you wanted to lease it to? A. We did discuss the property at Commerce and Ervay Streets, told him we wanted to lease it very much, and he said he wanted to build himself but matters had turned around so that he wanted to lease it; that if he had some one that was responsible and satisfactory to him, he would be very glad to go into it. * * * " On cross-examination, Mr. Davis testified:

"Q. Well, he (Andrews) went to Houston between the 1st and 15th (September) to see Jesse Jones, because he wanted to lease a piece of property in Dallas to build an office building on? A. I think so. * * *

"Q. He came back from Houston and you saw him (Mr. Andrews), and he told you that that piece of property you and

he had in mind for Jesse Jones was not big enough? A. That's right.

"Q. Well, then, he asked you if you knew of any piece of property that was large enough to satisfy Mr. Jones' requirements, did he? A. Yes, he did. * * *

"Q. You told him about the Slaughter property? A. Yes.

"Q. And then you and Mr. Andrews went down to see Mr. Slaughter? A. Yes, we did.

"Q. Andrews introduced you to Slaughter? A. Yes.

"Q. You told him (Slaughter) that you had an out-of-town man that was interested in coming here and putting up, that he wanted to lease a piece of property, that he wanted a piece of down-town property, and he said, 'I submitted one piece and that was too small, and after consulting Mr. Davis, and he suggested your property as being favorable for that purpose, and we came down to see if it was for lease.' Is that what happened? A. That is approximately what was said, that was the trend of it.

"Q. You understood at that time that it was Jesse Jones of Houston, that you went down there to see about it? A. Yes."

Mr. Andrews further testified: "We (Davis and Andrews) have talked about general real estate matters over town, and I had determined to go to Houston. * * * I wanted to talk to Mr. Jones about building a building in Dallas. I thought the Marvin corner might be a very attractive corner to him, so I procured information relative to a lease on the Marvin corner, and I went to Houston, saw Mr. Jones, but Mr. Jones said he was not interested in it. On my return to Dallas, I talked it over with Mr. Davis and told him that there might be a likely client there that we could get for this piece of property, that was large enough that he would consider in bothering himself to the extent of building a large building on it on a 99 year lease. We discussed various pieces of property and he finally spoke of the Slaughter property, being this property, that would be commensurate with what appeared to be Mr. Jones' idea of the size of property that he would likely give consideration to leasing and improving the property. He (Davis) asked me if I knew Mr. Slaughter. I told him I did. He suggested that we go to Slaughter's office and both of us see him and talk over the mat-

ter. We went to Mr. Slaughter's office together, and I introduced Mr. Hale Davis to him. * * * We discussed the matter at considerable length * * *, and he asked us to defer our meeting with him and come back next day * * * be there at 4 o'clock in the afternoon. That was my first meeting with him, in which Hale Davis was present. I said to Mr. Slaughter that I had in mind a man who lived out of town, that I wanted to assure him of this one fact, that he was financially able to take care of any contract that he might make, and that he could feel sure of that, and that he was qualified to lease the property."

Appellee Andrews further testified: "Well, we came away from Mr. Slaughter's office and the next day, in the morning, we got some information that Mr. Slaughter was ill and could not meet his engagement, which was at 4 o'clock. I called him up * * *; he said that he had been sick and unable to make the meeting, and that he was going out of town just as soon as he was able to leave, and that he wanted me to go and handle the matter with Mr. Flippen; that Mr. Flippen was authorized to go ahead and handle it and for me to take all matters thereafter up with Mr. Flippen while he was away."

■ We failed to see the relevant connection between the conversation Davis had with Slaughter several months prior to the conversation Andrews and Davis had with Slaughter in his office on October 1, 1925. To summarize: Davis, a real estate man, called Slaughter over the telephone and asked him if he wanted to lease his lot. Neither one knew the other. It is not shown that Davis introduced himself. He did not tell Slaughter he was a real estate man. He merely asked if he desired to lease his property, and Slaughter replied that he did to a satisfactory man. Can it be said that this created or tends to create a contractual relationship between Davis and Slaughter, whereby Davis could exact of Slaughter brokerage commission for the lease of his property? We think not. Andrews and Davis themselves did not so consider it, as, when they went to Slaughter's office several months later, Andrews introduced Davis to Slaughter and informed Slaughter that Davis was a "real estate man in the real estate business" and then "asked him if his property was for lease." We are of the opinion that

if appellee had any authority to negotiate at all, it was by virtue of the conversation had in appellant's office, and that authority was limited to the "prospect they had in mind," the one they "explained to Slaughter," an "out-of-town man," one who wanted to come to Dallas "and put up quite an office building," one who was "substantial," and "one who could carry out any obligation he might make."

In the case of Goode v. Sears (Tex. Civ. App.) 226 S. W. 463, 464, the real estate agent wrote to the owner to know if he would sell his land, asking his price and terms. Failing to receive an answer, he talked with him over the telephone, in which the owner stated his willingness to sell, fixing his price and terms. The real estate agent procured a satisfactory purchaser. After the sale had been concluded, the agent demanded a commission. The broker did not inform the owner that he was a real estate agent and would expect a commission from him. In that case, the court said: "A broker has no right to enforce the payment of a commission unless he has a contract, express or implied, by which the seller is obligated to make such payment. The mere fact that a broker is the procuring cause of a sale being made does not, as a matter of law, determine the question of liability on the part of the seller. Dunn v. Price, 87 Tex. [318] 319, 28 S. W. 681; Piper v. Allen (Mo. App.) 219 S. W. 98; Browning v. Dowell [Tex. Civ. App.] 218 S. W. 45. * * * A real estate agent may represent the purchaser as well as the seller. The seller is not therefore required to take notice that the transaction is being conducted by the agent for his benefit." So, in the instant case, at the time of the related conversation over the telephone, Davis and Slaughter were not acquainted with each other. The evidence does not show that Davis informed Slaughter that he was a real estate broker, or that Slaughter knew of such fact.

After carefully considering once more the entire record, we are of the opinion that the related conversations clearly show that appellees had no contract, express or implied, to negotiate a deal with Neiman-Marcus Company, by which Slaughter was obligated to pay them commission.

Immediately after the conversation of Andrews and Slaughter over the telephone, in which Slaughter told Andrews to go and handle "the matter" with Flippen; that

726

Flippen was authorized to go ahead and handle "it," and for me to take all matters thereafter up with Mr. Flippen while he was away, Mr. Slaughter left Dallas. The "matter" referred to evidently had reference to the client of appellees, "the substantial out-of-town man"—Jesse Jones. Appellees had no further personal dealings or conversation with Slaughter until a short time before Christmas.

On Slaughter leaving town, appellees, knowing that Neiman-Marcus Company had theretofore repeatedly been trying to close a deal with Slaughter (record shows through the real estate agency of Stewart and Miller), that it was very anxious for the property, and that the negotiations were at a "dead-lock" on the rate of rentals, began their negotiations through Mr. Flippen, submitting exchange of figures, of which none were ever agreed to by Slaughter; Neiman-Marcus repudiated the set-up attributable to them as a proposal for the rate of rentals; broke off further negotiations with appellees and directed them to refrain from interviewing Slaughter in their behalf. Whatever motive Neiman-Marcus Company may have had in breaking off further negotiations through appellees and renewing the negotiations with the agency of Stewart and Miller was not imputable to Slaughter.

During the time appellees were negotiating with Neiman-Marcus Company, Slaughter was not in Dallas, and on his return was advised by Flippen of appellees' negotiations and their futile effort to close the deal. On learning of Slaughter's return, appellees went to his office, Andrews doing the talking, said, "Well, now Mr. Slaughter, there is something very peculiar about this thing; we have been working awfully hard for you, trying to make this deal. * * *" And he said: "Well, don't say you have been working for me, you have been working trying to make a commission." I said, "Well, of course, I have been working trying to make a commission, but that doesn't alter the fact that we have been trying to make a good deal for you on this property here." He said, "Well, why don't you bring a check here with your proposition from Neiman-Marcus Company?" At that time Slaughter was then drafting the lease to Neiman-Marcus Company, on terms agreeable to them submitted through the real estate agency of Stewart and Miller, to whom the commission was paid. The

lease contract was executed and delivered a few days later.

Under the facts of this case, we are of the opinion appellees were not the procuring cause; and, if so, they had no contract of employment to negotiate a deal with Neiman-Marcus Company.

Motion for rehearing overruled.